May it please the Court, I'm Kevin Lilly on behalf of Appellant Pinkerton Government Services. We believe there's a veritable cascade of errors to talk about, but in the time that I have, I'd like to focus the Court on three. First, in this class certification decision, the Court ignored undisputed evidence that the on-duty meal break agreement in this case was neither involuntary nor universal. And that distinguishes this case from the Falkenberry case from the Abdullah case. This is not a uniform procedure. Isn't that a sculpting over the class issue rather than a whether there's a class or whether there is a class at all? If one could sculpt without getting to the merits, perhaps, but one can't here. In order to determine, in order to get to the end, in order to resolve a full issue, you have to get all the way through and determine the nature of the work. You also have to get all the way through and determine whether or not the on-duty meal break agreement was offered, whether it was employed, because it wasn't in all cases. So it isn't a matter of, there's no easy way to say that the on-duty meal break agreement applied to these, if not others. We have Ms. Avalos' own situation, right? Why can't she, again, this becomes a sculpting issue rather than a class issue, whether there's a class or not. Why can't she represent everybody in a similar situation to her? Whatever happened with her case, she was offered the choice. Whatever the differences are, why can't she at least represent the people that are just like her? Well, I think that would presuppose a different motion for class certification. I think it is the plaintiff's burden. Okay, let's not get tangled up in the procedural issues here. Let's ask the substantive question. What is it that would preclude her from representing that class at least? Maybe more than that, but at least that class. I think at a minimum, she might conceivably be able to represent people who worked at her location. That's a defense. The question is, could she represent the people that were required to sign this agreement? No one was required to sign the agreement. Well, that's not her allegation. She says, I was required to sign the agreement. So there is evidence in the record. She says that she, well, that would be an individual question. Well, but she says, not only was I required to sign this agreement, but others were required to sign this agreement. No evidence of that. Counsel, when you say no evidence, so for example, there's her testimony, and there's 30B6 deponents offered by Pinkerton that indicated that between, some of them said 100 percent. Between 90 and 100 percent of these folks were in this hypothetical class that we're dreaming up. I'm very glad Your Honor brought that point up, because it's based upon the Court's selective reading of Mr. Kampanen's deposition testimony. I believe it's page 73 of his deposition testimony. Mr. Kampanen said, was asked, how many, how often was the on-duty meal agreement used? In other words, how many locations was it offered? And he said, oh, maybe 90 percent or more of the time. That he, two pages later. I read it, and he's not the only witness. But two pages, well, he is the only 30B6 witness, and there's no other witness that can make the point that the Court tried to torture this into. Two pages later, Mr. Kampanen said that people who signed this agreement, it's not universally employed. There are people who signed the agreement where it's not needed, where it's not used. I read it. I appreciate that. So there's also evidence in the record that, for example, the timesheets did not have a space to even employ so that people could, to use, I should say, so we don't have a pun problem, so that people could take these off-duty meal breaks. There was one non-30B6. In other words, she was not offered for the purpose of that. And she said, I did not see in a specific set of wage statements blocks for time. But there's also at least six witnesses placed into the record who said, I was given unpaid breaks. So there is no evidence that there's a class-wide system where people were not offered off-duty meal breaks. You seem to think there isn't persuasive evidence of that, but you're telling me, in fact, that there isn't any evidence. Well, there is. No, I don't think there is any evidence other than anecdotal and specific to an individual. There's Ms. Avales, and there's one witness who was a non-30B6 witness who said, I didn't see in the particular wage records that I looked at. But there are other conflicting people who said, I was given unpaid records. Could we get back to Judge Kuczynski's question? Because you mentioned that nature, and I think it's maybe sort of a hybrid response to both of the questions my colleagues were getting at. In passing, you mentioned nature of work and seem to think this is not an affirmative defense. I actually don't believe it's an affirmative defense, but I don't really think that's an important issue. Because under Vannoli and Wells Fargo, I think an affirmative defense is not a disfavored stepchild in the law. Because something is an affirmative defense does not mean it is an insignificant thing in the class circuit. Right, but my question was different, and I just wanted to be clear. Your briefing argues that this is not an affirmative defense. Is that your position today? I do believe that's the case, but I don't believe it's critical to the courts. There's a question before the court right now. Thank you. So could you address, in some of the time you have left, let's assume, contrary to your arguments, that we find that the judge didn't abuse his discretion in certifying the so-called non-waiver class. Could you address the waiver class? The new resolution agreement? Yes, I would be delighted to read that. First tell us, were these agreements uniformed? Was it everybody's agreement? The same. They are not the same because they changed over time. And also when they were signed puts them in different situations. Some of them only waived class actions and others had class actions in arbitration. The agreement was implemented in June of 2011, right after the Concepcion case came down. During that case, this case was pending during that time. So there is a group that were terminated, for example, Mezavalas, who the agreement doesn't apply to at all. She never signed it. She left the company. That's the so-called non-waiver class. I'm asking about the waiver class. So tell me what the agreement says. The waiver class, well, there are people who did not opt out, remember, it's a voluntary agreement. And they had the right, and many did, that there are the people who did not opt out and were employed both before and after. Tell me what the agreement says. The agreement says it's a classic Concepcion dispute resolution agreement, that you can have free arbitration, individual arbitration of your claims in this case. And how many of those agreements contain class action waivers? All of them. So everybody who is in the so-called waiver class has signed an agreement that both requires disputes to be arbitrated and waives class action. Has agreed not to become a part of this case. Some people opted out after the DAR was presented to them, and some people didn't. All current employees had the opportunity to, and many did. So those who opted out are in the non-waiver class. Correct? The dispute resolution agreement would not have played a role. Okay. So with respect to that group of people, what I've called the waiver class, is there a common question of law or fact? That is a common question, but there may be also not common questions. And you're speaking specifically with regard to the arbitration? Right. The judge did something, certified a subclass, conditionally, alternatively. I wasn't clear what the common issue of law or fact to that subclass was. And so I want to ask your opponents that, but I also want to ask you. Is there a common issue of whether these waivers are valid? Is there a common issue of whether they were forced to sign them? I'm just not sure what issue is there with respect to this group. I don't think there would be a common issue as to whether or not they were forced to sign them. Is there an issue of validity? One could litigate the language of the agreement, because the language certainly has in common. But if I might make a point, leveraging or not, just very briefly, Your Honor, is that once you bring these people into the court, you've defeated the purpose of the agreement. Well, I understand that, and that's what I'm trying to figure out. Didn't the judge say that a common question, I mean, just for the sake of facilitating the argument, didn't the judge say the common question would perhaps be whether Concepcion could be, would render these valid, could be expanded? In other words, these weren't consumer class action waivers. I think he hypothesized that that could be the common question. I recall the court as buying into the National Labor Relations D.R. Horton theory, which no court has bought into. And he saw that as a common issue. He did. I think he made three points along those lines. Would Ms. Aviles have standing to fight those fights? I can't see that she would. In fact, her interest would be antagonistic towards the class. Okay, thank you. Thank you. Good morning, Your Honor. May it please the Court. My name is Larry Lean. I represent the appellee in this matter. Counsel, could you answer the question I just asked most recently, which is as to this class action waiver class, subclass, would Ms. Aviles have standing to fight those fights about whether or not that's enforceable? Yes, she would have standing, Your Honor. And that's because she was subject to the prior arbitration agreement. But it didn't have a class action waiver in it. That's correct, Your Honor. But the defense we would raise, Your Honor, would be, and again, not to mix up the words waiver, but that the defender appellant here waived the right to even compel arbitration, to even enforce the DRA, the new one. As to Ms. Aviles, certainly, that's your position. But is it also your position that it's too late for Pinkerton to come in and demand arbitration as to any of these folks? That's correct. Why? That's correct, Your Honor. Why? I mean, I understand the argument as to Ms. Aviles. I'm not sure about it, but I understand it. But they showed up as soon as you moved for class certification and said, there's a bunch of folks who don't belong in this class action because we have these agreements with them. When should they have, at what earlier point should they have raised this? They should have compelled Ms. Aviles' claim to arbitration. Well, but did they make, so is your argument is that they waived Ms. Aviles' claim to arbitration, they waived it as to all their employees forever? That's correct, Your Honor, because she's, I'm sorry, Your Honor. What case do you cite for that? Actually, there's no federal case on point, but there's two California cases. Well, but that was after class certification occurred. I mean, she's in there saying, I want class certification. I want to represent a class of a whole bunch of people. And your opponents show up and say, wait a minute, not this group. We have agreements with them to arbitrate, and they've also waived class action status. And you're saying since they didn't make that argument as to her, they waived it as to the rest of them? That's correct. And actually, the California case that recently came out, Hendershot v. Ready to Roll Transportation, is exactly on point. That was where also a class action was pled, wasn't certified, and before certification, the defendant employer there made certain employees sign releases, similar to arbitration, said I'm paying you $5, you're out of this case.  After the case was filed. But these waivers, as I understand it, were signed prior to this case being filed, were they not? No. It was signed after the case was filed. Okay. They even identified this case as a. That's part of the opt-out. It says these are pending, and if you want to opt-out, you can opt-out. Correct. Correct, Your Honor. Right. And going back to common question, there's another common question is whether these can be applied retroactively after a case is filed. Let's get back to the question that Judge Kristen asked about your client being able to be a class representative for this group. So it seems like there's a difference. Forgive me. There's a difference, I think, between whether she has standing to fight the fight about waiver, which you're just mentioning, and then quite a different question about whether she has the standing to fight the fight for the common questions that the judge identified, whether Concepcion could be expanded, for example, or the NLRB decision as to the validity of the waiver itself. That may be, and that may be a position we will not even raise. We can not argue that argument, so we can only raise the argument that we actually have standing upon. And so your argument is that she would be an adequate representative and she would have standing because her position would be, is apparently that it's too late for Pinkerton to raise any of these arbitration agreements because they didn't demand arbitration of Ms. Avila's. Correct. Let me pose a hypothetical for you, and this is the way class actions usually end. The other side comes in and says, here's a million dollars. I'm picking a number out of the air. We want a settlement with the entire class. And is your client then the appropriate representative to settle with the other side about how that's allocated among people who have waiver agreements and non-waiver agreements? So if I could see the defendant saying, I have a crappy case with respect to the non-waiver class, and I've got a pretty good case with respect to the waiver class, but I'd like to get rid of all of them. In other words, they have different litigation risks, so they value the claims differently. Yeah. And so then we've got a representative who's in one group but not the other coming to an agreement with somebody on this or negotiating on it. That, in the real world, that troubles me. In other words, some of your class clients have different strengths of case, it seems to me. There's no, whether or not you're right about the Concepcion defense, at least you've got to deal with it, and at least you've got to fight about it, and as the other folks, you don't. So doesn't that really place them in different situations? No, it doesn't, Your Honor, and here's why. That's not our case in chief. Whether there was an arbitration agreement with a class waiver signed, that's not our case in chief. No, I understand it's not your case in chief, but your opponent says, and I think with some force, one of the things we bargained for was not to have these people in a class action, and they agreed not to be in one. Now, that agreement may or may not be enforceable, but it does seem to be kind of strange to say, we'll decide that in the class action somewhere down the road, because then they've lost the benefit of their bargain. Well, you're hypothetical, Your Honor, and here's how it practically works, and I do this a lot, but the defendant would typically want a release, like you say, for everybody, whether they signed it or not, and in that respect, they can waive that defense. They can say, okay, for settlement purposes, I'm going to waive my ability to argue the arbitration issue for settlement purposes. But have they waived their ability to argue the waiver issue? In other words, your client only had an arbitration clause, right? Right. And they didn't enforce it against her. But these other folks made a separate promise, which is that we won't become part of a class action, and they couldn't have raised that defense as to your client because she hadn't signed that kind of agreement. So how did they waive their ability to raise that issue as to the other people? Well, again, I guess that goes back to my prior argument, is that's putting the cart before the horse. The first step is to compel arbitration. And, again, we would take the position that the procedural right to even move to compel arbitration has been waived because they never raised it as to your client. And assume that's true. Assume that these folks have still signed an agreement not to be part of a class action, have they not? That's correct, Your Honor. And that agreement, and you're saying the way we'll determine the validity of that agreement is in a class action. I'm sorry, Your Honor, I didn't hear that. You're saying the way we'll determine the validity of that agreement is in a class action. Well, that agreement may be valid. I'm not saying that the agreement is valid for all purposes. But for purposes of this case, we would argue that their right to compel arbitration, whether under the old arbitration agreement or the new one, has been waived because they never compelled arbitration. So why would the failure to raise it as to Ms. Avalos under the old arbitration agreement waive it as to people in the new arbitration agreement? They might feel that they have a weak case to enforce arbitration as to her because she doesn't have an opt-out clause. I mean, I don't know why they did it, but they may feel that way and say, well, we don't want to raise it against her. We're going to lose. Why would that apply or bar them from raising it as to the people who are in the new arbitration agreement? Because in a class action, Ms. Avalos is a representative of the class. But this is what we have to decide, whether she is a proper representative. And she's in a different – she's not similarly situated. If she's in a different position, then what we'd say is, no, she can't represent them because this is a different agreement. They have different rights. And the very point you're pushing is actually hurting you. If, in fact, you're saying this applies to everybody else, even the people in the new agreement, that just shows that she's not a proper representative for at least that part of the class. It's sort of cutting the grout out for under yourself. Well, I think it would be unfair because if that were the rule, then any time an employer sued in a class action, a putative class action, they can simply implement all sorts of different arbitration agreements. There's automatically no class action. You can never have a class action because we're just going to institute an agreement that, yeah, maybe the class rep had originally, but we're going to change it up a bit. It's a sculpting issue. It's a question of why can't the employer say, look, we've got this ongoing problem. We want to stop the bleeding. What we're going to do is stop a lot of liability. And so as to from now, this point forward in the future, we now have a different agreement. And it doesn't mean that whatever claims existed before that aren't valid, but we say we're going to cut it off. What is illegitimate about having an employer change practices in response to litigation in order to limit liability as to future conduct? What's evil about that? I would think that that is sort of what's desirable. There's nothing inherently evil. Employers can always change their policy. But you make it sound so evil by saying, oh, well, if you do this, you could never have a class action. Well, I think it's true. But that's not true, is it? You could have a class action. You just wouldn't have a class action that continues as to future conduct. That may be true. But I think in this case, the context is a bit different. I think the appellant should have at least preserved their right by seeking to compel arbitration. Has there been any demand for arbitration? No, not at all, Your Honor. Even since there was a certified, even since this order on certification? Correct, Your Honor. There's not been a motion to compel arbitration. Compel whom to arbitrate? She's the only one before the court right now. Whom could they compel? They don't really have a dispute with anybody else but her. The question is whether she can represent the rights of other people. They can't say, well, all these people who are not suing us, we want to compel them into arbitration. We don't even know if they have a dispute with those people, do they? Well, these are certified class members. Well, I know, but that's the thing that we're wrestling with here. Should they be certified? Should they be certified? I agree. Nobody in that class has showed up and said, I have a claim. If they did, the other side would say, I guess I'd like to arbitrate. If that has happened, that's what we're trying to get at. If that has happened, we don't see that here. We can't see that that's happening. No one has physically come forward. I mean, we've sent out class notices. Physically or in any other way. What happens is the judge certifies the class and includes in it a group of people who we don't, who the other side doesn't know whether it has a dispute with because they have an agreement that says, when I have a dispute, I'll let you know and we'll arbitrate it. And we're trying to figure out whether your client can effectively represent that group by bringing them into this class action. Right. And since nobody's challenged numerosity, by the way, it's difficult to tell whether we're talking about three people or 300. So this may not be a minor issue. And that part of the record is pretty opaque. I hear you, Your Honor. And in that respect, Your Honor, it is still setting aside the merits of the arbitration agreement. It is still susceptible to class-wide adjudication again. They can then come raise now, let's say the order stays as it is. The defendant can then come in and say, okay, I want to move to compel arbitration and waive, have those class members sign the new DRA, have their rights. He's compelling arbitration of what? Arbitration of what? Of the certified claims. Of the certified claims. The claims that were certified. They can say, we want to come in. We want those people who signed the new DRA to have those class members. So essentially they would create a subclass by moving a motion against part of the class. As I say, it moves to arbitrate as a part of the class. Doesn't that, again, sort of cut the ground out from under you? Doesn't that sort of pretty much prove that this is a different class of people? I don't think it's a – because, again, the case in chief is the same. Well, let me do it this way then. If nothing else, if it's not a 23A issue, why isn't it a 23B3 issue? Why isn't it a predominance issue? Because even if they have a common question that you've urged, and I think very persuasively, as to these folks, why isn't the predominant question that they don't get out of the starting box, out of the gate, if they sign the class action waiver? Well, I don't think that was raised as a predominance issue in the underlying motion. Well, the judge actually does discuss it, though. He starts by saying they're not raising it, but I'm discussing it in his order, and he spends quite a bit of time. He certainly recognized that this was an issue out there, and he recognized it as a crossover issue between 23A2 and 23B3. Right, and I believe that it is still – the judge raised the same issues that we've raised here, which is there's a waiver issue, again, the waiver going to whether they waive the right to arbitration, as well as the conception, whether that still can be expanded to employment. And I think the judge, in that respect, found that that was still a predominant question. But he doesn't talk about standing. And as to those issues, those potential defenses, what I would imagine – and the district judge certainly anticipated that they will be raised by Pinkerton. As to those issues, I struggled to see how Ms. Avila has standing. I guess the standing would then come back to what defenses would we raise in opposition to a waiver. Well, but we is different than Ms. Avila's. I mean, I understand that she's represented by class counsel. But the judge – the judge worries about this. It's clear that the judge is concerned about this. And the judge says, I'm certifying this class, but – So now you have four judges worried about this. Now I may be wrong, the judge says, not quite. So let me certify some subclasses in the alternative. And one of the subclasses is the waiver subclass, right? Correct. Who – if that subclass is certified, who is the class representative? It would still be Ms. Avila's. Even though she's not – even though for exactly the issue it was certified. We're separating out this group because they have a separate question about these waivers. She doesn't have one, but she's going to be the person that represents that group in litigation. She can still have standing as to whatever – Well, I'm not – But put aside standing. Your position – we keep not letting you answer. Your position, I think, is that she's got standing as to your 23A, your common question. Right. Right, numerosity. So she gets past 23A on your scorecard. But I don't know how she gets past 23B. There's this – she's got a predominance problem, it seems to me. And also she's got a standing problem. If we view this as an aggregation of a whole bunch of claims, she's got to have standing. But I think both of those issues goes to what defenses would Ms. Avila – I won't use the word we, but what defense Ms. Avila would use to oppose the arbitration agreement. If she uses an argument that applies to both her arbitration agreement and the new DRAs, she would obviously have standing. So if that's your position, then I think you've got an adequacy problem because what you're telling me is your class representative is going to have one hand tying behind her back and she can't raise some of the defenses that some of these unrepresented class members might have as to the class certification waiver. I don't necessarily think that that's an adequacy problem because I think that – Well, then it may be a typicality problem. They certainly overlap. But if what you're saying is that she can't raise some of the defenses that these other folks might have, she's got a real problem, right? I don't know. I don't call it a problem. I think that's more of a strategy call to say, okay, which defenses are we going to raise? Obviously, in every case, we're not going to raise every defense. There may be some defenses. For example, I submit to this Court, look, the Concepcion and the recent case off in California, the Supreme Court has made it pretty clear that waivers are legitimate. And so I don't think I would, you know, come in and say, well, it's still illegitimate. This is improper. I would say, okay, I submit. Assuming that that agreement itself is a valid agreement, but is there still have the defendants or appellants waive the right to compel arbitration? And I think on that defense, Ms. Aviles would have standing. So your argument is maybe this is just premature, that we should let this go forward and she can fight the fight that she's got standing to fight. And if she loses that fight and they get down to the merits about the enforceability of the waiver provision itself at that point, that they may be able to sever off part? I absolutely agree with that point, Your Honor. I have a slightly different question. You're way over time. But I wonder if I could ask just one more question. Sure. And this is really shifting gears. But under California law, I think the briefing is inconsistent about the extent to which this affirmative defense nature of work is an individualized inquiry. Could you address that briefly, please? Yeah. We don't believe that there is any inconsistency. We have the Falkenberry case, and we now have the Abdullah case from the Ninth Circuit. So you think the answer is what? I believe that there is no individualized issue in a nature of work defense. And the nature of work defense really looks at the five factors. I got the five factors. Okay. And I think I have your case authority to answer my question. So thank you. Okay. Well, explain it to me because I don't get it. Okay. Certainly, Your Honor. The five factors, and I'll say it's number one is the type of work. Number two here is the security guard, security officer industry. Well, they say that it's all over the place. Sometimes it's a security officer. Sometimes it's a first response officer. Sometimes it is a toxic cleanup officer. So they dispute that. Sometimes they're on the job by themselves. Sometimes they're off the job, and they have to respond quickly. So they dispute that. How do you deal with it? Well, first of all, those issues have been addressed by Falkenberry and Abdullah repeatedly. Those examples were made in those cases. There are different types of locations that officers work at, whether it's a hospital, a retail industry, a building, anything. And they could certainly, at any point during the day, be doing a different job. But the wording does not, and I really ask, Your Honor, to look at the wording of the five factors. Not looking at the minute details of each person's job from day to day. It is the nature of this work. And it strikes me, and I suppose this is not relevant to today's issues, that you and your opponents may switch sides on this issue when we get to the merits. On the merits, it seems to me that if the nature of the job is being a security officer and a first responder, then it may well be necessary to keep people on site to eat. But if the nature of the job depends on where they're sent, then perhaps there are lots of people that don't need to remain on site. But I recognize that both you and the other side have taken positions that I think may be contrary to your eventual positions on the merits on this one. That's an observation. It's not a question. So your answer is that it's not an individualized inquiry. Correct. Today, that's your answer, but it's a generalized inquiry. That's always been my answer, Your Honor. How does that actually work? I'm sorry, Your Honor? How does that actually work? I mean, there's California law that provides certain circumstances under which an on-job meal break can be taken, right? And what they're saying is whether or not it is is different from each member of the class. So there are no class determinations you can make because the person who's guarding a warehouse by himself in the middle of the night is different from somebody who's a first responder at a veterans hospital or involved in doing potential cleanup efforts at a toxic waste facility. So they're saying, you know, as to each one, the question of whether or not you can or cannot force an on-job meal break is different. What's your answer to that? I mean, you know, do all the five factors. It sounds to me pretty persuasive, actually. So why don't you persuade me that they're wrong on that? I have a multitude of answers, Your Honor. First of all — You know, whenever lawyers tell me they've got a multitude of answers, it means to me I don't have a good answer to this question. So why don't you give me sort of the good answer to that question? Okay. Well, first of all, they treated this as a class issue. They made everybody sign — I don't want to talk about them. How does the evidence roll out? I would like you to answer my question. Yeah. I would like you to answer my question. We would look at it from a macro level, looking at the nature of these jobs. If you look at it from that level — I know that's how you want to look at it. They, however, say you can't, because the jobs are all different. And if you apply the California law, what the job is bears directly on whether or not you have a valid claim. And that varies for — depending on the job, and different submembers of the class have different jobs. And they're wrong on that, Your Honor. That was the citation by appellant to the Vannoli and Wells Fargo case. That was addressed directly by Abdulla. Abdulla rejected that very argument. They say, okay, Vannoli and Wells Fargo looks at the minute details of each person's job. How is it different from person to person? This is a different set of laws. This is not that type of a claim. So your view is that under the California law, what job do we look at then? You say approaching it from a macro level, which scares me because I never understood economics. Is it the average? I understood micro. I never did that. And Judge Kaczynski would do it from a micro level. So tell me, what hypothetical Pinkerton security guard do we look at to determine the class-wide? Sure. For example, they have job descriptions for the officers, and it is identical. It talks about the general duties. That is the true nature of the work. Again, I'm focusing on the actual wording of the five factors. It is the nature. The nature of the work. The nature of the security guard work. Because your position is that the nature of the work for every member of the class is the same. Yes. And going within the nature of the work, the five factors, one of the factors is the availability of relief by other workers. They've admitted that over 80% of the shifts here have two or more workers on that shift. That shows that there is available workers to provide relief. But they would still have this affirmative defense, right? I think the cases that you're pointing us to, Falkenberry certainly talks about the fact that there's a uniform policy that gets you past certification. If you can answer all of the requirements that Dukes and Wal-Mart and so forth requires, and you've made a persuasive argument as to that, hypothetically, let's say we agree with you that this is an affirmative defense, the defendant still gets to come in then and argue that as to the 10 or 20% that those folks got meal breaks. That's what these cases say. Yes. They would still get to do that. And my question really is, is how does that evidence roll out? Is this amenable to class resolution? Do they have to do an individualized human being by human being analysis? Is it a location by location analysis? Or how do they get to prove their affirmative defense? No. It goes back to Judge Kaczynski's original statement of this could be a sculpting issue. Well, mine was a question. I didn't make any statements. It was a question, but a sculpting issue. And that's why the district court certified the various subclasses. How does it work, counsel? How does it work? If I agree with you, you've got a common question. Tell me how this affirmative defense gets played out on a class action basis. Well, the affirmative defense, again, this is going back. The burden is on the employer. I'm past that. Yeah. And so the defense would be on the defendant here to show that the nature of the work itself. I know that, counsel. I know that. So the defendant says, well, we have a bunch of people who work by themselves, as Judge Christin asked you. 20% of the class work by themselves. How does the defendant show that? They'll show it individual by individual? That's the question. I understand there's a burden shifting. It's an affirmative defense. But they do have the right to bring this defense. So is it an individualized showing that they have to make as to the 10 or 20% of the folks who they say got breaks? Or how does that work? Well, the 10, 20% that got breaks, they would be out of the case. They could be out of the case. If they got breaks on all their shifts, they would not be part of the case. Okay. Now, what about the group of people that are single parents? I mean, the only people at the facility. We've sent one person at the facility, and they say the nature of the job is if the guy leaves, bad things can happen when the guy leaves. How do they prove that one up? Well, they would have to show what happened. They have to show actual evidence. Individual or class? A location by location or individual by individual? Or how does that work? You keep saying it's generalized. Right. No, I don't do the defense in this. I don't know what they would show. But from my perspective. Well, unfortunately, you have to deal with it because if they have to do an individualized defense as to each member of the class, that pretty much shoots your class action. Well, of course, they're going to take that position. Certainly undermines it severely, right? They would obviously come in with that position. My response to that would be looking at, again, at the macro level. What type of work? What is the nature of this work? Do they have the availability to provide relief? But isn't that an individualized? See, that's the thing. At a minimum, it seems location by location. Because if you don't look at location by location, you don't know whether there are other workers there. But I don't think that defeats classification. It goes to the predominance issue, doesn't it? It goes to the predominance issue, doesn't it? No. Whether you have availability, you don't need to go location by location. That can just be looked at on a record level. Here's why I think it goes to predominance. Go back to 23A, and let's say you've got the common question about whether or not there was a uniform policy. Right? That common question can still be gobbled up. Right? But it can still lose at the 23B level if the bigger question is that the affirmative defense is going to require so it's not an individual by individual determination. So it's not. It could be the case that the affirmative defense makes this not susceptible to a class-wide resolution. That's what I'm trying to get you to answer. Right. And from our position, and again, they would take a different position, but our position is it would not. We do not need to go location by location, individual by individual, because we look at the corporate records first of all. For example, one of the factors is availability. You can look at 80% or more have two people or more. But does that necessarily answer the question? So let's take out the big class issue for a second. Let's assume that this agreement violates California law except if the nature of the job requires these people to remain in place. And then the question is, they come in and say, yeah, we have two people at the nuclear facility watching the gate. But if anybody ever comes, we're going to need two people to ward them off. So as to that one. We've got two gates. We've got two gates. Or what we promised them is two people on security. One guy, as long as he's available quickly and can show up, that's fine. It sort of sounds to me like that's individualized. And my response would be, okay, let's look at the type of work this is. Is this a limited workforce? These, quite frankly, no disrespect to security officers, but they are plentiful of security officers. There are many companies out there. But, counsel, some of the locations look to us from the record like they're a whole lot more sensitive than others and that the customers are demanding somebody's right there on it all the time, the nuclear facility. Let's use that example. So it seems to me at least as to those locations, if there's two gates and two human beings and it's really a sensitive area, that the defendant should be able to come in and prove up their affirmative defense and say that at this location we've shown you that the nature of the work is such that we couldn't give an off-duty meal break. Why can't they do that? Because they can provide an additional person. They can simply bring in a third person or fourth person or fifth person. Okay, so now you're arguing. Yeah, you just provided another dispute, another individualized dispute as to whether they could or could not in particular. You just sort of complicated the matter and you sort of added more weight to the individualized determination and away from the common issue. But that's not an individualized issue, Your Honor. You're relying on Abdullah. Correct. Because Abdullah says that if the employer has a staffing model where they say we're only staffing this with one person and that's what's driving the problem with the meal break, then that's a completely different situation. And that did not defeat class certification in Abdullah. I'm not trying to put words in your mouth, but I am saying that you're 20 minutes over time. And is that the shorthand version of your response, Abdullah? Partially. In addition, I would add to that and say the fact that they're able to have more than one person on a post favors us even more. In Abdullah, they had only one person. So that's an additional defense the employer in Abdullah had. Here, they say, oh, in our post, we have two or more. Well, that's already one factor in our favor on the nature of the worker defense is the availability of other workers. So that actually. So you think they would have to show that? They would have to show that there weren't other workers available. Correct, Your Honor. And we can show the staffing level of the company, the amount of workers they have available on hand. And that, again, is shown on a macro level. And I think that can be proven on a macro level. Okay. Thank you. Thank you. I think you're out of time. I recall I had seven seconds left. We actually have nine. I don't know whether it's red or yellow. I'll give you a minute. How about that? It's red. So I think you're in minus. I'll give you a minute. Okay. Two points then, Your Honor. First of all, with respect to the Abdullah case, the Abdullah court was very careful to point out that there was only a single issue advanced by the defendant in that case. And that was the single model. And if one looks at the record here, that's not the case. The second point is a logical extension of the colloquy we just heard. And the innovation in this case, which has never before reached the court of appeal on any decision, is that the nature of the work can be determined on, as counsel puts it, on a macro level. If that's the case, then Rule 23 has changed the substantive rights of the parties. Let me explain. If you took a guard at one of these sites, say at Excerpts of Record 223, a single guard with a security clearance alone, that guard arguably, as counsel suggests, that my client has the resources, it enterprises a whole, perhaps we lose. As it enterprises a whole, that agreement fails the test. Tomorrow, the client loses that contract. It's now a single guard at a single site. They win. The law has changed because it's a class action. That's what the Rules Enabling Act prevents. That's what Dukes prevents. Thank you. Thank you. The case is argued. We'll stand submitted. We're adjourned.
judges: Kozinski, Christen, Hurwitz